# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2026

Lyle W. Cayce
Clerk

———————

No. 25-40397

———————

WENDY TIPPITT, *as the administrator of* THE ESTATE OF TIMOTHY MICHAEL RANDALL,

*Plaintiff—Appellee*,

*versus*

SERGEANT SHANE IVERSEN,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:23-CV-515

———————————————————

Before RICHMAN, DUNCAN, and OLDHAM, *Circuit Judges*.

PER CURIAM:[*]

Sergeant Shane Iversen shot and killed Timothy Randall during a traffic stop in Rusk County, Texas. Randall's estate sued under 42 U.S.C. § 1983, asserting that Iversen's use of deadly force violated Randall's Fourth Amendment right against unreasonable seizure. The district court denied Iversen's motion for summary judgment on the basis of qualified immunity.

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 25-40397

Iversen filed this interlocutory appeal.  We dismiss the appeal for want of jurisdiction because we conclude there is a genuine dispute of fact material to the determination of qualified immunity.

**I**

Early in the morning of September 14, 2022, Sgt. Iversen pulled Timothy Randall over for failure to fully stop at a stop sign at the intersection of State Highways 42 and 64 in Rusk County, Texas.  The parties dispute whether justification existed for the stop; the body camera footage and Sgt. Iversen's deposition suggest that Sgt. Iversen could not see the stop bar.  Responding to Sgt. Iversen's emergency lights, Randall turned left off Highway 64 and pulled over on County Road 4125.  Sgt. Iversen radioed into dispatch that he was performing a traffic stop.

Sgt. Iversen then approached Randall's vehicle.  Iversen and Randall exchanged pleasantries.  Iversen informed Randall that he had pulled him over because "[he] blew that stop sign back there."  Randall disagreed, asserting that he "came to a complete stop at that stop sign."  For approximately 10 seconds, Randall and Iversen disputed whether Randall had failed to come to a complete stop.  During a subsequent deposition, Iversen described Randall's conduct at this point as "somewhat uncooperative."

Sgt. Iversen ordered Randall out of the vehicle.  Randall indicated assent, and then asked, "Did you sh—Can you show me that I blew—" Sgt. Iversen interrupts: "Step out."  Randall responded, "OK. I'm stepping out."  Randall then opened the vehicle door, stepping out as he says, "I'm just wondering."  After Randall is out of the car and facing the officer, he put his wallet in his back pocket.  Iversen instructs him to turn around and put his hands "right there real quick."  Randall turns to face the vehicle and appears to be adjusting his belt and pants as Iversen asks him "You got anything on you you shouldn't have?"

2

Sgt. Iversen then moves Randall's hands away from his belt and to the top of the vehicle. Randall complies. Iversen instructs him: "Keep your hands out of your pocket." Randall denies that his hands were in his pocket: "No—I—I wasn't." As instructed, he keeps his hands on the top of the car vehicle while Sgt. Iversen begins patting down Randall's beltline. Feeling something suspicious, Sgt. Iversen put his hand down the front of Randall's pants. Randall's hands remained on top of the car.

Simultaneously orally commanding Randall to put his hands behind his back, Sgt. Iversen grabbed Randall's right hand and moved it toward Randall's back. Randall moved his hand back up, toward the roof of the car. He protested, "I don't have anything on me, officer!" Sgt. Iversen then repeated the command to put his hands behind his back. A second later, Sgt. Iversen had placed Randall's right hand in a wristlock, and he had Randall in a half-nelson with his other arm. Randall had his left hand raised. He protested again: "I don't have anything on me!" Sgt. Iversen again commanded Randall to put his hands behind his back, but as he did so, Randall's left arm was held in position by Iversen's half-nelson. Randall's hands remained up as he pleaded with Sgt. Iversen to tell him why he's under arrest: "Can you tell me what I'm under arrest for? Please. Please—"

Sgt. Iversen adjusted his hands and threw Randall to the ground. Randall landed on his hands and knees, with Iversen on top of him. Iversen tried to put Randall in a half-nelson as Randall rose to his feet. Failing that, Sgt. Iversen put his arm across Randall's throat and suplexed him. Sgt. Iversen fell in the process. Randall was flung to the ground and—carried by momentum—rolled away from Sgt. Iversen, as the officer rose to his knees and drew his gun.

Randall rose and turned to flee, with his palms at chest-height, open to the officer. Sgt. Iversen fired one shot. The bullet entered Randall's chest

No. 25-40397

at the right, traversed it, and settled on the left side of his torso. Randall cried out and continued to flee, running into a mailbox and then collapsing some distance down the road. He died at the scene. The object in Randall's pants that had apparently alarmed Sgt. Iversen turned out to be a meth pipe in a soft glasses case.

Wendy Tippitt, Randall's mother and the administrator of his estate, sued Sgt. Iversen, alleging that his use of deadly force violated Randall's Fourth Amendment right to be free from unreasonable seizures. Tippitt also asserted state-law tort claims. The district court's denial of qualified immunity to Randall as to Tippitt's constitutional claims are the only issues before the court in this appeal.

## II

## A

"To prevail on an excessive force claim, a plaintiff must show '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable.'"[1] It is undisputed that Randall's death resulted directly from Sgt. Iversen's use of force. We accordingly ask whether that force was excessive and objectively unreasonable.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."[2] In *Graham v. Connor*,[3] the Supreme Court "clearly establishe[d] the general proposition

_____

[1] *Windham v. Harris County*, 875 F.3d 229, 242 (5th Cir. 2017) (quoting *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017)).

[2] *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

[3] 490 U.S. 386 (1989).

that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."[4]    In *Tennessee v. Garner*,[5] the Supreme Court set forth the general proposition that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[6] Accordingly, as a general proposition, it violates the Fourth Amendment for an officer to use deadly force against a suspect who poses no immediate threat to the officer and no threat to others.

In the qualified immunity context, however, general propositions are not dispositive.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[7] The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."[8]  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*."[9]  "*Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'"[10] Barring an obvious case, Sgt. Iversen's motion for summary judgment

---

[4] *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled in part on other grounds by*, *Pearson v. Callahan*, 555 U.S. 223 (2009).

[5] 471 U.S. 1 (1985).

[6] *Id.* at 11.

[7] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson*, 555 U.S. at 231).

[8] *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[9] *Saucier*, 533 U.S. at 202 (emphasis added).

[10] *White v. Pauly*, 580 U.S. 73, 80 (quoting *Brosseau v. Hagen*, 543 U.S. 194, 199 (2004)).

succeeds unless the plaintiff "identif[ies] a case where an officer acting under similar circumstances as [the officer] was held to have violated the Fourth Amendment."[11]

"To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment."[12]  "[T]he Fourth Amendment requires . . . that a court 'slosh [its] way through' a 'factbound morass.'"[13] We devote "careful attention to the facts and circumstances" of "the incident, as then known to the officer."[14]  These include the severity of the crime that gave rise to the stop, actions the officer took during the stop, and the conduct of the stopped individual—particularly whether the stopped individual "pose[d] an immediate threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight."[15]  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[16]

## B

Once the defense of qualified immunity has been properly raised, the plaintiff bears the burden to negate it.[17]  However—at the summary judgment

---

[11] *Id.* at 79.

[12] *Barnes v. Felix*, 605 U.S. 73, 76 (2025).

[13] *Id.* at 80 (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 382-83 (2007)).

[14] *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[15] *Graham*, 490 U.S. at 396.

[16] *Id.*

[17] *Shumpert v. City of Toledo*, 905 F.3d 310, 320 (5th Cir. 2018).

stage, in qualified immunity cases as elsewhere—"[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[18]

The jurisdiction of this court is limited when it reviews an interlocutory appeal of the district court's denial of summary judgment. "We only review whether the factual disputes identified by the district court are material to the denial of qualified immunity—that is, whether the factual disputes viewed in favor of the plaintiff make out a violation of clearly established law."[19]  That is to say, we review only the materiality—not the genuineness—of any factual disputes identified by the district court. Summary judgment must be denied if the plaintiff's version of the facts permits a finding that the official is not entitled to qualified immunity.[20]

The exception to this general rule is that, where there is video evidence, we may "view[] the facts in the light depicted by the videotape."[21] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

---

[18] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (applying the rule of *Liberty Lobby* to the qualified immunity context).

[19] *Poole v. City of Shreveport*, 13 F.4th 420, 423 (5th Cir. 2021).

[20] *See Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009) ("We therefore adopt [the plaintiff's] version of the facts and make all reasonable inferences in his favor for purposes of this appeal. . . . Once we have narrowed the interlocutory appeal to issues of law, we review the district court's resolution of these issues de novo."), *abrogated on other grounds by*, *Mullenix v. Luna*, 577 U.S. 7 (2015).

[21] *See Scott v. Harris*, 550 U.S. 372, 381 (2007).

for summary judgment."[22]  A video is probative, not necessarily dispositive, of what a reasonable officer would have perceived.[23]

## III

### A

The district court identified several facts it concluded were undisputed and one fact it concluded was genuinely disputed.  The facts identified by the district court as undisputed are that "(1) Randall was never armed with a weapon; (2) Iversen never observed a weapon on Randall; and (3) Randall's hands were open and empty as he was (4) turning to get away from Sgt. Iversen when the shot was fired."  After viewing the video, we cannot endorse the district court's conclusion that it is *undisputed* that Randall was turning to flee at the moment Sgt. Iversen shot him.  However, the dashcam video and autopsy are competent evidence from which a reasonable jury could reach that conclusion.

In our court, Iversen advances a different set of facts.  He contends that Randall, upon rising after being thrown to the ground the second time, rushed at Sgt. Iversen.  The dashcam video does not conclusively resolve this question.  For an instant, Randall leaves the frame of the video as he rolls away from Sgt. Iversen.  When Randall re-enters the frame, however, shortly before he is shot, he appears to be moving down the road, away from but at least partially facing the officer.  The bullet entered Randall's chest at the right side of his chest, traversed it, and settled on the left side of his torso.

_____

[22] *Id.* at 380.

[23] *See Poole*, 13 F.4th at 424 ("Although Briceno argues that the video does not show the exact angle at which he was looking at Poole, it is close enough to Briceno's vantage point . . . to be probative of what he saw.  Evidence need not be conclusive to be relevant.").

No. 25-40397

This is competent evidence from which a jury could conclude that Randall was turning to flee, not rushing at Sgt. Iversen.

As required by *Graham* and by the Supreme Court's recent directive in *Barnes v. Felix*,[24] we consider the totality of the circumstances.[25]  This includes the crime for which Randall was stopped and the extent to which Randall physically resisted the officer.[26]  The district court concluded that the evidence was equivocal as to whether Randall had, in fact, committed a traffic violation.  It reasoned that Randall's remaining offenses, for which probable cause developed after the stop began, would not justify the use of deadly force: possession of an open container of alcohol, driving while intoxicated, possession of drug paraphernalia, and possession of methamphetamine.  It found no evidence that Randall's resistance constituted the crime of assault of a peace officer.

The district court characterized Randall's resistance as passive.  It considered Randall's verbal questioning of the officer and noted that Randall's physical contact with Sgt. Iversen arose only through Iversen's escalating use of force.  Randall did resist placing his hands behind his back.  However, prior to attempting to physically force Randall's hands behind his back, Sgt. Iversen's preceding oral command was for Randall to keep his hands out of his pockets, and his last physical impulse was to place Randall's hands atop the car.  The totality of the circumstances includes the fact that Randall was subjected to rapidly-evolving commands.[27]  Within two seconds

---

[24] 605 U.S. 73 (2025).

[25] *Id.* at 80.

[26] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[27] *See Harper v. Perkins*, 459 F. App'x 822, 827 (11th Cir. 2012) (unpublished) (considering conflicting commands within the totality of the circumstances in a Fourth Amendment excessive force analysis).

of orally commanding Randall to place his hands behind his back, Sgt. Iversen had Randall's right arm in a wrist-lock and his left arm in a half-nelson—actions that may have made it difficult for Randall to comply. Randall's only further resistance was attempting to stand after Sgt. Iversen threw him to the pavement. This is competent evidence from which a jury could conclude that Randall's resistance was non-violent.[28]

The district court identified as a genuinely disputed fact "whether a reasonable officer would have mistakenly believed the meth pipe to be a gun." Assuming without deciding that the officer's mistaken belief that Randall's meth pipe was a weapon would materially change the analysis—even in the absence of a furtive reach for it—we may not, at this stage, resolve disputed questions of material fact in the officer's favor unless the video evidence compels the conclusion that there is no *genuine* dispute.[29] The video reveals that an otherwise unremarkable stop turned violent shortly after Sgt. Iversen felt something in Randall's pants, but that does not speak to the reasonableness of Sgt. Iversen's belief that the meth pipe was a weapon or that Randall had retrieved it. Because the district court has identified "questions of credibility [that] arise with respect to whether a meth pipe felt during a pat down could reasonably be believed to have been a small handgun," and because the video does not conclusively resolve this question in Sgt. Iversen's favor, we must provisionally resolve it in favor of Randall.

---

[28] *See Darden v. City of Fort Worth*, 880 F.3d 722, 733 (5th Cir. 2018) ("The law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting."); *cf. Cantu v. City of Dothan*, 974 F.3d 1217, 1230 (11th Cir. 2020) ("[R]esisting arrest alone is not enough to justify the use of deadly force. Especially not when the resistance is non-violent, as it was in this case." (citation omitted)).

[29] *See Tolan v. Cotton*, 572 U.S. 650, 659 (2014).

"To the extent that credibility questions exist, of course, a fact-finder will be necessary."[30]

The district court also noted that Sgt. Iversen issued a warning—"Get down!"—in the very same second that he shot him, and concluded that the warning was thus "effectively null." Officers must issue a "warning before deadly force is used 'where feasible.'"[31] Given the limited distance between Sgt. Iversen and Randall, it is not clear that a warning would have been feasible.

When we resolve all genuine disputes of material fact in Randall's favor, the following factual scenario is plausible: a police officer deployed deadly force against a visibly empty-handed DWI suspect who was fleeing from the officer, with his palms facing out around chest-level, whom no reasonable officer would infer was armed based on the pat-down, and who prior to the officer's deployment of deadly force had non-violently resisted the officer's rapidly-evolving commands. From these facts, a jury could conclude that Randall posed no immediate threat to the officer and no threat to others, and accordingly that the deployment of deadly force violated the Fourth Amendment.

We emphasize that Sgt. Iversen's subsequent discovery that Randall was unarmed has no bearing on our conclusion. "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."[32] "An officer's use of deadly force is not

---

[30] *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 436 (5th Cir. 1993).

[31] *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

[32] *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017).

No. 25-40397

excessive, and thus no constitutional violation occurs, when the officer *reasonably believes* that the suspect poses a threat of serious harm . . . ."[33]

**B**

At the second step of the qualified immunity analysis, we ask whether—by September of 2022, when the events occurred—"existing precedent [had] placed the statutory or constitutional question beyond debate."[34] "[W]hile the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene."[35] "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"[36] "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[37]

Under Tippitt's version of events, Randall was visibly unarmed and fleeing on foot when Sgt. Iversen shot him. "Common sense, and the law, tells us that a suspect is less of a threat when he is turning or moving away

_____

[33] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (emphasis added).

[34] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[35] *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

[36] *Mullenix*, 577 U.S. at 12 (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

[37] *Plumhoff v. Rickard*, 572 U.S. 765, 778-89 (2014).

12

from the officer."[38] "[A]n officer violates clearly established law if he shoots a visibly unarmed suspect who is moving away from everyone present at the scene."[39]

## IV

Were a jury to accept Tippitt's version of the facts, it could conclude that Iversen violated Randall's clearly established Fourth Amendment right to be free from unreasonable seizure. "[W]e have no jurisdiction to review a district court's determination that there are genuine disputes of fact where we have decided, as a matter of law, that those factual issues are material" to the officer's entitlement to qualified immunity.[40] "We rule only on the state of the summary-judgment record, and we express no view on the ultimate facts that may be determined at trial or on the ultimate merits of any claim."[41]

\* \* \*

The appeal is DISMISSED.

---

[38] *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021).

[39] *Id.*

[40] *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012).

[41] *Id.*